Mack Perlman v. Commissioner. Fred Perlman v. Commissioner.
Perlman v. Commissioner
Docket Nos. 10699, 10700.
United States Tax Court
1947 Tax Ct. Memo LEXIS 55; 6 T.C.M. (CCH) 1120; T.C.M. (RIA) 47286; October 23, 1947
Morris E. White, Esq., 1002 Citizens Bldg., Tampa 2, Fla., and Hervey Yancey, Esq., for the petitioners. Edward L. Potter, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies in petitioner's income taxes for the fiscal years ended July 31, 1941, 1942 and 1944, as follows: Docket No.
1941
1942
1944
10699
Mack Perlman
$2,751.63
$16,438.22
$51,342.19
10700
Fred Perlman
2,730.53
16,514.93
51,377.07
The tax consequences of the year 1943 are reflected in the 1944 deficiencies due to the forgiveness feature applicable to those years. The question involves the validity of a family partnership. The returns were filed with the collector of internal revenue for the district of Florida. Findings of Fact Prior to *56 1927, the merchandising business out of which the presently questioned family partnership grew was individually owned by Herman Perlman, the husband of Katie Perlman and the father of Cornelia Schoem (also known as Mrs. Ira Schoem), and of petitioners Mack Perlman and Fred Perlman. At that time the business consisted of two retail stores located, respectively, in Tampa and St. Petersburg, Florida, and conducted under the name of U.S. Salvage House. The type of merchandise sold was men's apparel, mostly work clothing and other items that would appeal to the working class trade. Petitioners worked for their father on weekly salaries. In 1927, Herman Perlman incorporated his business under the name of West Coast Army Stores, Inc. He caused 52 shares of the corporation to be issued to himself, and 24 shares each to be issued to petitioners. The business gradually grew and other stores were opened in other cities in the locality of Tampa. In 1930, in order to obtain the obvious advantages of supplying the retail stores from his own wholesale business, Herman Perlman organized and incorporated a wholesale merchandising business under the name of Empire Mercantile Company, Inc. Three *57 shares of this corporation were issued to Herman Perlman, one share each to petitioners, and 95 shares to Westcoast Army Stores, Inc. During these years petitioners were actively engaged in business with their father. In 1933 it was discovered that Herman Perlman was suffering from cancer, a malady which caused his death on January 5, 1935. Shortly before he died he called in petitioners and requested them to take care of their mother, Katie Perlman, which they assured him they would do. He also discussed Cornelia Schoem with petitioners and wanted them to take care of her. By his will, which was admitted to probate in the County Judge's Court for Hillsborough County, Florida, on January 19, 1935, Herman Perlman bequeathed all his stock in West Coast Army Stores, Inc., Empire Mercantile Company, Inc., and Hahn Department Stores, Inc., to petitioners, share and share alike. He then bequeathed his residuary estate to his widow, Katie. The will made no provision at all for Herman's daughter, Cornelia. Petitioners were named and qualified as executors without bond January 19, 1935. The residuary estate bequeathed Katie consisted solely of cash in the bank in the amount of $1,237.66. *58 The stock in West Coast Army Stores, Inc., and Empire Mercantile Company, Inc., was appraised at $33,622.18, and the Hahn Department Store stock at $300. The entire estate was appraised at $35,159.84. Under the law of Florida, [1] in effect at the time of Herman's death, a widow was entitled to elect to take dower instead of under the terms of her husband's will, "* * * which dower shall be one-third part in fee simple of the real property and one-third part absolutely of the personal property owned by her husband at the time of his death * * * free from all liability for the debts of the decedent, all estate and inheritance taxes and all costs, charges and expenses of administration * * *." Petitioners were advised that their mother would be entitled to a third of Herman's estate if she elected to take dower. They thereupon promised her that they would take care of her on this basis. Katie did not elect against her deceased husband's will, but allowed his estate to be distributed in accordance with the terms thereof, and executed a broad receipt acknowledging full satisfaction *59 of all claims against the estate. After Herman's death and during the administration of his estate, petitioners continued to operate the businesses of West Coast Army Stores, Inc. and Empire Mercantile Company, Inc., as they had been operated before. They felt that the wisest course to pursue was to wait until the completion of the administration of the estate before making any provisions for carrying out their promise to their mother. During this period, however, they did pay their mother a salary out of the corporations assets totaling $6,997.90. On February 11, 1936, the probate court ordered the stock held in Herman's name distributed to petitioners. On April 29, 1936, their final accounting as executors, showing the distribution of $1,237.66 in cash to Katie and the balance of the estate, consisting of the stock mentioned, to themselves, was approved by the probate court. On June 3, 1936, petitioners were discharged as executors of their father's estate. Subsequent to their discharge as executors, petitioners proceeded to liquidate Empire Mercantile Company, Inc., and used its assets, consisting of the wholesale business, to form a partnership between themselves and their *60 mother. The books of the corporation were closed September 30, 1936. On October 1, 1936, books of account for Empire Mercantile Company, a partnership, were opened. The capital account for the partnership showed net assets of $27,570.53. Of this amount, $9,190.18 was credited to the capital account of petitioner Mack Perlman, $9,190.18 to the capital account of petitioner Fred Perlman, and $9,190.17 to the capital account of Katie. Objection had been taken by the Bureau of Internal Revenue to the $6,997.90 paid to Katie as a salary during the administration of Herman's estate. As a result of this, it was determined that she should repay this amount, and it was set up on the partnership books as a loan receivable from Katie. When she subsequently repaid this sum to the partnership, it was divided equally between the three partners, Katie receiving $2,332.64. The amount originally credited to Katie's capital account, plus the subsequent credit of $2,332.64, roughly approximated a one-third interest in Herman's estate. On December 31, 1936, the corporation, West Coast Army Stores, Inc., was liquidated by petitioners and its assets, consisting of the retail stores, were brought into *61 the partnership, and thereafter both the wholesale and retail businesses were operated by the partnership, Empire Mercantile Company, although separate sets of books were kept for the operation of the retail stores, one set being on one group of stores being kept in the name of West Coast Army Stores, and another set on the remaining stores being kept in the name of Florida West Coast Army Stores. The capital account of the West Coast Army Stores was kept as Mack's capital account, while that of Florida West Coast Army Stores was kept as Fred's capital account. The capital account of Katie in the partnership was not increased by the addition of the retail stores to the partnership assets. Her capital account, however, grew by the addition thereto of profits not withdrawn, so that on July 31, 1941, her capital account stood at $22,524.38. Cornelia Schoem, petitioners' sister, was married to a newspaper reporter, and had a child born shortly after Herman's death. She lived in New Jersey. Because she had received nothing under her father's will, petitioners felt a moral obligation to assist her and her family. Some discussion was had about her husband coming to Tampa and joining the *62 business in which petitioners were interested, but he decided to remain with his newspaper work. Petitioners then decided to give their sister a $5,000 interest in their business. To accomplish this, they at first executed a note to Cornelia for $5,000, then later determined to create an interest for her by periodic gifts into a capital account. Accordingly, the $5,000 note was recalled and destroyed, and on March 31, 1937, a capital account was opened for Cornelia Schoem on the books of the partnership with an initial credit of $1,000. Subsequent credits resulting either from gifts from petitioners or partnership profits, less debits for withdrawals, brought Cornelia's account up to $5,750.21 as of July 31, 1941. Neither Katie nor Cornelia at any time performed any services for the partnership or the business in which it was engaged. The partnership created October 1, 1936, was by oral agreement, and no written agreement was ever executed. During the years 1937 to 1940, inclusive, distribution of the partnership profits, as between petitioners and Katie, was made on a basis of the ratio of their capital investments at the beginning of each year. Cornelia received varying amounts, *63 averaging about $60 per month for the entire period. The distribution of profit for this period was as follows: Fiscal year
1937
1938
1939
Jan. 1 - July 31, 1940
Mack Perlman
$ 6,805.82
$ 7,091.85
$11,279.47
$ 6,868.59
Fred Perlman
7,808.58
6,958.10
11,118.55
6,737.97
Katie Perlman
4,173.89
2,857.24
5,220.46
3,556.20
Cornelia Schoem
1,043.47
462.02
615.50
252.52
Totals
$19,831.76
$17,369.21
$28,233.98
$17,415.28
From October 1, 1936, until the latter part of 1940 the business operated without change under the management and control of petitioners. The wholesale business was operated under the name of Empire Mercantile Company, and the retail stores continued to be operated under the name of West Coast Army Stores, although they were owned by the partnership, Empire Mercantile Company. The business continued to grow, and in the fall of 1940 the partnership was operating 12 retail stores in 11 different cities in Florida, with a new one under construction. Helen Perlman is the wife of Mack. They were married in 1927 and have two children, the older of which was 11 and the younger 5 in 1941. Rita Perlman is the wife *64 of Fred. They were married in 1926. They have one child, who was 13 years old in 1941. In late 1940, when the Selective Service Act was passed and war seemed imminent, petitioners began to feel concern over the effect of the national situation on their business. In the conduct of their business they had made it a policy to employ men younger than themselves because they wanted younger men who could grow up with the organization and, too, they wished to avoid the awkwardness of being superiors of and giving orders to men older than themselves. Consequently, the Selective Service Act found them with the key men in both the wholesale and retail organizations subject to the draft. At the time the partnership had about 60 employees; of this number only five or six employed in the wholesale organization in Tampa and one or two cashiers in the retail stores were women. The general store supervisor, the advertising manager, the stockroom and warehouse manager, and many of the store managers were not only of draft age, but were of an age where they would be likely to be called into military service. As matters turned out, eventually, except for Alex Bokor, their general store supervisor, *65 every key employee in the Tampa wholesale office, and some 40 of their permanent retail store personnel - about 75 per cent of their managers, assistant managers and permanent clerks, either enlisted or were inducted into military service. Petitioners believed that, unless something were done to meet the emergency, they were faced with the loss of their business. Realizing that it was going to be necessary to substitute women for men in various positions in the organization, and that it was likely they would have to replace themselves, petitioners discussed the problem, first among themselves, then with their wives, Helen and Rita, their mother, Katie, and with various top employees in their organization. They also discussed it with their uncle, Samuel Bokor, who operated in Tampa a retail store, similar to those operated by Empire Mercantile Company, under the name of Tampa Army Store. His interest lay in the fact that he was being supplied with merchandise by Empire Mercantile Company and was being assisted in the operation of his business by petitioners. At that time Empire Mercantile Company was employing three cousins of petitioners, all of whom were of military age. Other than *66 these cousins, petitioners had no other relatives outside of their immediate family except Samuel Bokor and his wife, the father and mother of two of the cousins. After considerable discussion and though, it was decided at the end of 1940, as a measure to meet the serious situation in which they found themselves, and to preserve their business, to form a new partnership as of January 1, 1941, and bring into it the wives of petitioners and Samuel Bokor and his store, the partners to be petitioners, Katie Perlman, Cornelia Schoem, Helen Perlman, Rita Perlman, and Samuel Bokor. In forming the new partnership, although it was agreed that it should be formed as of January 1, 1941, books of account were not set up until August 1, 1941. This was because the books of the old partnership and the books of Tampa Army Store, originally owned and operated by Samuel Bokor, were kept on a fiscal year beginning August 1, and ending July 31 of each year. Because of delay in getting the partnership agreement in writing and the books set up and because their accountant desired to continue on the same fiscal year basis, it was agreed that, in setting up the partnership books, the figures as shown by *67 the annual accounting of July 31, 1941, should be used. To arrive at the total capital account of the partnership, the net assets of the old partnership and of the Tampa Army Store, totaling $86,100.54, were added to the profits of the old partnership during the last five months of 1940 and the profits of the new partnership for the first seven months of 1941, in the sum of $58,381.45, and the profits of the Tampa Army Store for the last five months of 1940, in the sum of $4,886.29, making a total capital account for the new partnership of $149,368.28. The capital accounts of the individual partners were determined as follows: To the new partnership Samuel Bokor had contributed his store and its profits for the period August 1, 1940 to December 31, 1940, an interest in which was given to petitioners. The net assets of the store were determined at $4,687.11, and its profits for the period July 31, 1940 to December 31, 1940, were $4,886.29. This, added to the $3,600.26 as Samuel Bokor's distributive share of the profits of the new partnership for the period January 1, 1941 to July 31, 1941, totaled $13,173.66. In setting up Samuel Bokor's capital account in the new partnership, *68 $4,443.65 was deducted from the $13,173.66 and transferred to Mack Perlman, and a like amount deducted and transferred to Fred Perlman. A book adjustment of $10.19 charged to Mack and credited to Samuel Bokor and a similar adjustment of $10.18 charged to Fred and credited to Samuel Bokor fixed his capital account in the new partnership at $4,306.73. Mack transferred to the new partnership net credits from his capital accounts in the old partnership of $28,599.08. His distributive share of both the old and the new partnership profits for the entire fiscal year August 1, 1940 to July 31, 1941, amounted to $17,477.41. To these two sums there was added the $4,443.65 transferred to him from Samuel Bokor and a $33.39 item transferred to him from Fred, making a total of $50,553.53. From this amount there was deducted the sum of $19,964.08, which he transferred to his wife, Helen, as a gift, and the $10.19 book adjustment item transferred from him to Samuel Bokor, thus fixing Mack's capital account in the new partnership at $31,079.26. Fred transferred to the new partnership net credits from his capital accounts in the old partnership of $27,819.76. His distributive share of both the old *69 and the new partnership profits for the fiscal year August 1, 1940 to July 31, 1941, amounted to $17,477.41. To these two sums there was added the $4,443.65 transferred to Fred from Samuel Bokor, and $750.21 transferred to Fred from Cornelia, making a total of $50,491.03. From this amount there was deducted the sum of $19,464.09, which Fred transferred to his wife, Rita, as a gift, the $33.39 item transferred from Fred to Mack and the $10.18 book adjustment item transferred from Fred to Samuel Bokor, thus fixing Fred's capital account in the new partnership at $30,983.37. Katie transferred to the new partnership net credits from her capital account in the old partnership of $20,444.38. Her distributive share of both the old and the new partnership profits for the fiscal year August 1, 1940 to July 31, 1941, amounted to $2,080, making a total of $22,524.38. From this amount there was deducted the sum of $8,660.32 transferred from Katie to Helen as a gift, and the sum of $8,660.31 transferred from Katie to Rita as a gift, thus fixing Katie's capital account in the new partnership at $5,203.75. Cornelia transferred to the new partnership net credits from her capital account in the *70 old partnership of $4,550.21. Her distributive share of both the old and new partnership profits for the fiscal year August 1, 1940 to July 31, 1941, amounted to $1,200, making a total of $5,750.21, or $750.21 over and above the $5,000 interest petitioners had agreed to give her. To adjust this, $750.21 was transferred from Cornelia to Fred, thus fixing Cornelia's capital account in the new partnership at $5,000. A capital account for Helen was created mainly by the gifts to her from Mack and Katie. Helen's distributive share of the profits in the new partnership for the period January 1, 1941 to July 31, 1941, amounted to $8,273.19. To this was added the gift of $19,464.08 from Mack and the gift of $8,660.32 from Katie, thus fixing Helen's capital account in the new partnership at $36,397.59. A capital account for Rita was created mainly by the gifts to her from Fred and Katie. Rita's distributive share of the profits in the new partnership for the period January 1, 1941 to July 31, 1941, amounted to $8,273.18. To this was added the gift of $19,464.09 from Fred, and the gift of $8,660.31 from Katie, thus fixing Rita's capital account in the new partnership at $36,397.58. A gift *71 tax return was filed by the donor for each of the above mentioned gifts. Although it was decided that a written partnership agreement would be executed at the time it was determined to form the new partnership in 1940, the agreement was not actually reduced to writing and signed until some time later. After some discussion the general terms of the partnership were agreed upon. The matter of a written agreement was then taken up with the firm's accountant, Dave Schwartz. He was busy at the time with income tax reports for various clients and it was some time before the details were worked out. The matter was then taken up with the firm's attorney, who delayed it further. The agreement was eventually reduced to writing in the fall of 1941. It was then studied by the various partners and signed, then sent to New Jersey for the signature of Cornelia. When it was returned, it came into the possession of Fred. At that time the date on the instrument was still blank as to the day and month, but the year 1941 was typed in. Because it was then so close to the end of the year 1941, Fred inserted the month and day as January 1st and wrote a "2" in ink over the "1" in 1941, leaving the instrument *72 dated January 1, 1942. The agreement recites that the parties had theretofore been operating under an oral partnership agreement. Among other things, it set up the capital account of each partner as follows: Fred Perlman
$30,983.37
Mack Perlman
31,079.26
S. Bokor
4,306.73
Katie Perlman
5,203.75
I. Schoem
5,000.00
Rita Perlman
36,397.58
Helen Perlman
36,397.59
$149,368.28
The agreement provided that petitioners should perform the duties of supervisors and managers of the partnership business; that Samuel Bokor should continue to act as manager of the retail store formerly owned and operated by him individually; that Helen and Rita should assist petitioners and assist in the field inspection of the retail stores and in the purchase of all merchandise. Katie and Comelia were to perform only such duties that might be imposed upon them. Petitioners, Samuel Bokor, Helen and Rita were to be paid such salaries as might be agreed upon. The agreement further provided that Katie should receive the sum of $40 per week and Cornelia $100 per month in lieu of all profits out of the partnership. In addition to his salary, Samuel Bokor was to receive a third of the *73 net profits of the store formerly owned and operated by him individually. The balance of net profits was to be divided equally between Mack, Fred, Helen and Rita. Notification of the taking of the new partners into Empire Mercantile Company was given to Dun & Bradstreet, the firm's bank, their insurance companies, and other interested parties. The department heads in the office in Tampa were told that the wives were becoming partners, and the retail store managers were notified that they had become interested in the business. The state and city store licenses were taken out in the names of all the partners, and insurance policies were written in the names of all the partners. The Florida statute requiring registration of fictitious business names was complied with, in which proceeding all the names of the partners were published and registered with the clerk of the Circuit Court for Hillsborough County, Florida. However, due to an oversight of the firm's attorney, this was not done until the early part of 1943. When Rita came into the Empire Mercantile Company, she had a white housekeeper living at her home to help her attend her household duties and look after the child. Helen *74 had a maid to do the housework, and her mother, who lived with her, looked after her children. Helen and Rita knew nothing about the business of Empire Mercantile Company except what they had learned at home from conversation with their husbands from time to time. When it was decided to take them into the business, so that they could take the places of petitioners in the event they should be called into service, and to assist in the management, in any event, they were brought to the business offices of Empire Mercantile Company, shown around the offices and stockroom, taken to the various retail stores and given a general idea of what the business was about. They were then put through a period of schooling by their husbands and by Alex Bokor, the general store supervisor, in which they were taught what the petitioners did, how merchandise was handled in the stockroom or warehouse, what was carried and why, all about the merchandise shipped to the retail stores, how the displays were run for the stores; in general, everything they should know about conducting a business having branch retail outlets supplied by a single wholesale unit. They were then taken by Alex Bokor to the retail *75 stores and instructed in their operation and management and the surrounding business conditions. They were also taken to New York on buying trips by petitioners for the purpose of acquainting them with the buying phase of the business. The instruction they received was preparation to actively manage the business in an emergency and to assist in management generally. After the initial schooling of Helen and Rita, they took over in a large measure the work of the general store supervisor, a man then earning $8,000 and subsequently $12,000 per year, in traveling to and making field inspections of the various retail stores located throughout the central part of Florida. In making these field inspection trips, they traveled in company owned cars and occasionally by bus. They never traveled together. It was left up to them as to when to make the trips, it being their job to keep contact with the stores. Each of them visited each store about five or six times a year. They consulted with the store managers concerning all phases of retail store operation, including the type of merchandise, its prices and competitors' prices, demand for merchandise, progress on requests, the store personnel *76 and store appearance. They shopped similar merchandise in competitors' stores and checked competitors' prices with their own. They made written reports of these field inspections. They were often in executive consultation with the other active partners, and discussed the matters contained in their reports and consultations with the other partners. Gradually, as Helen and Rita caught on to the routine of business operation, they began to make suggestions for the improvement of the business in their reports and consultations with the other partners. They noted that their competitors were selling higher priced and better quality goods, discussed this with the store managers, and then suggested to their husbands that the partnership follow suit. The business had originally started off as a work clothing outlet, and had largely continued as such down to the time Helen and Rita come into it. Petitioners and their top employees never seriously considered changing the general character of the merchandise carried. Upon Rita's insistence, however, a stock of jewelry was put into the stores, and a line of army officers' uniforms, equipment and insignia was carried; also a line of boys' clothing. *77 In one twelve months' period the total sales on officers' uniforms totaled about $150,000 with a gross profit from this item alone of about $60,000. Helen suggested going into the sportswear line, which eventually became one of the main items of merchandise. Helen and Rita were in accord in working to get a line of ladies' ready-to-wear put in the stores, a type of merchandise with which the partnership had had no experience. Petitioners were more strongly opposed to entering this field than to any other suggestion made by their wives. Eventually, however, the wives won the other partners over to their side and a woman's store was opened. They also suggested changing the name of the retail stores from West Coast Army Stores, because the name was not attractive to the new class of trade that the business was beginning to cater to. Furthermore, the name made it difficult to install nationally advertised brands of merchandise in the stores. The discussion on this matter went on over a period of years, as petitioners were afraid of losing the good will established under the old name. In the end, the name of all the retail stores, except the two in Tampa, was changed to Fremac's, a combination *78 of the first names of the petitioners. The wives made a great many suggestions, many of which were adopted. During the period presently in question, there was a material change in the kind of business done by the partnership that was particularly noticeable in the retail stores. The work clothes originally stressed so heavily were relegated to an unimportant position; the area they occupied in a store being small by comparison to the space previously given them. Sportswear and quality clothing took over as the prime items of merchandise. After the changes in the business which were brought about by the wives' recommendations and insistence on their adoption, the sales of the partnership were increased tremendously, with a proportionate return of profit. Although the partnership agreement provided for the payment of salaries, none were paid to any of the partners. During the period here in question, the net profits of the partnership were distributed to the various partners as follows: Fiscal Years Ended
July 31, 1941 *
July 31, 1942
July 31, 1943
July 31, 1944
Mack Perlman
$17,477.41
$ 28,241.29
$ 48,573.26
$ 51,426.84
Fred Perlman
17,477.41
28,241.29
47,573.25
51,426.84
Rita Perlman
8,273.18
28,241.29
48,573.26
51,426.83
Helen Perlman
8,273.19
28,241.29
48,573.26
51,426.84
Samuel Bokor
3,600.26
11,449.69
15,919.31
14,467.67
Katie Perlman
2,080.00
2,120.00
2,040.00
2,080.00
Cornelia Schoem
1,200.00
1,200.00
1,200.00
1,200.00
Totals
$58,381.45
$127,734.85
$213,452.34
$223,455.02
*79 Rita and Helen Perlman used their share of the profits in Empire Mercantile Company largely the same way. Considerable sums were used to pay income taxes in the following amounts: Fiscal Year
Ending
Rita Perlman
Helen Perlman
1941
$ 588.26
$ 588.27
1942
8,543.40
8,441.40
1944
33,966.28
33,920.67
$43,097.94
$42,950.34
Payment of their income taxes was handled by Rose Negin, a trusted and highly confidential employee of the firm, who acted as treasurer of Empire Mercantile Company. It was her practice, pursuant to instructions from the partners, to withdraw cash from the capital accounts of the partners and purchase tax bonds with which she subsequently paid the income taxes. Upon instructions of Helen and Rita, Rose Negin also withdrew cash from their capital accounts and purchased government bonds for them. At the suggestion of the firm's bank, these bonds were purc ase in the joint names of the wives and their husbands. After *80 their purchase, Rose Negin made a record of the purchase and put the bonds in a safety deposit vault, the bonds of each individual being kept separate from those owned by anyone else. Neither of petitioners ever had possession of or claimed any interest in his wife's bonds. Between November 1942 and July 1944, Rita purchased bonds in the amount of $39,650; Helen in the amount of $40,721. Both Helen and Rita had a drawing account of $50 per week, each deposited this in a joint bank account with her husband. Each petitioner drew $100 per week and deposited it in his joint bank account. Family household expenses were paid by checks drawn on the joint bank accounts. In addition to the above, both Helen and Rita were charged on the books of the firm with the premiums of certain life insurance taken out for the benefit of the firm, and with small personal items which they bought for themselves and charged to the firm. These charges totaled about $4,000 each for Helen and Rita during the years 1942, 1943 and 1944. Helen used further sums in the purchase of clothes, gifts to her family, vacations and entertainment during trips to New York and various places. Rita bought antique furniture, *81 a fur coat for $1,500, jewelry in the amount of over $4,000, and other luxuries she had never been able to have before. The total drawings charged against Helen's account for the years 1942, 1943 and 1944 amounted to $113,927.93. The drawings charged against Rita's account for the same period totaled $113,798.11. The respondent determined that neither Katie Perlman, Cornelia Schoem, Helen Perlman nor Rita Perlman were members of the partnership, Empire Mercantile Company, for the fiscal years ended July 31, 1941, July 31, 1942, July 31, 1943 and July 31, 1944. He determined that all the partnership profits distributed to Helen during this period and half the amounts distributed to Katie and Cornelia were chargable to petitioner Mack. He further determined that all the partnership profits distributed to Rita and half the amounts distributed to Katie and Cornelia were chargable to petitioner Fred. Samuel Bokor was accepted by the respondent as a partner in Empire Mercantile Company, and there is no question concerning the amounts distributed to him. Opinion The questions are whether petitioners' mother, sister and wives were partners. We think the mother and wives were partners *82 but that the sister was not. Katie, the mother, was a valid partner by virtue of what we consider her capital contribution to the partnership. Her husband died leaving an estate valued at $35,159.84, of which $33,622.18 represented stock in West Coast Army Stores, Inc. and Empire Mercantile Co., Inc. Under his will Katie was bequeathed a residuary estate of only $1,237.66. Under local law Katie could have elected to take a one-third dower share of her husband's estate rather than take under his will. She refrained from so electing on the understanding that petitioners would take care of her which they did by means of the presently contested partnership interest. Under these circumstances, we think it would be unfairly technical and unrealistic to say that Katie's interest in the partnership did not derive from a capital contribution originating with her but was a gift from petitioners. For these reasons we consider Katie a valid partner. We also consider Helen and Rita as valid partners by virtue of the services they contributed and the circumstances of their entry into the partnership. These have been stated in the facts and need not be repeated here. Their services strike us *83 as substantial and vital under the circumstances. The reason for their entry appears to us to have served a legitimate and valid business purpose. From these facts and circumstances, and the entire record, we are satisfied that petitioners really and truly intended to and did carry on business with their wives as partners. Respondent's argument as to the wives tends to belittle the value of their services. But the fact that the wives were inexperienced and less valuable to start with than their husbands were to the business does not impress us as a barrier to their partnership status. This is particularly true in view of the wartime emergency situation giving rise to the wives' inclusion. After a very careful consideration of all the facts and circumstances pertaining to the wives' relationship to the business and for the reasons suggested above we have concluded that Helen and Rita must be considered valid partners. Cornelia, the sister, we think, was clearly not a partner. Petitioners in fact do not seriously contend that she was. She contributed no capital originating with her and performed no services. Petitioners were merely helping her out financially. There was no intention *84 to carry on business with her. We conclude and hold, therefore, that Katie, Helen and Rita were valid partners but that Cornelia was not. The income received should be attributed equally to petitioners from whom her capital account originated. Decision will be entered under Rule 50. Footnotes
1. Sec. 35, Ch. 16103, Laws of Florida 1933; Compiled General Laws of Florida, Supp. 1936, Sec. 5507(1).↩
*. This is the distributive share of Mack Perlman, Fred Perlman, Katie Perlman and Cornelia Schoem for a full fiscal year; and of Rita Perlman, Helen Perlman and Samuel Bokor for the first seven months of 1941.↩